**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Springfield Division**

| | |
|---|---|
| ANDREW ZIMMERMANN and KELLY ZIMMERMANN, as class representatives for the *ZIMMERMAN* ACTION CLASSES,<br><br>Plaintiffs,<br><br>v.<br><br>BDO SEIDMAN, LLP CHIPETINE NEU & SILVERMAN LLP, and KOSTIN, RUFFKESS & COMPANY, LLC<br><br><br>Defendants. | Civil Action No.<br><br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiffs Andrew Zimmermann and Kelly Zimmermann, as class representatives for the certified classes in the action pending in this Court styled *Zimmermann v. Cambridge Credit Counseling Corp.*, Case No. 03-cv-30261-MAP (also cited as *Zimmerman* (sic) *v. Cambridge Credit Counseling Corp.*) (the "*Zimmerman* Action") (collectively, "Plaintiffs"), for their complaint against defendants BDO Seidman, LLP ("BDO"), Chipetine Neu & Silverman LLP ("Chipetine"), and Kostin, Ruffkess & Company, LLC ("Kostin") (collectively "Defendants), upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, allege as follows:

## NATURE OF THE ACTION

1.      This action is related to the *Zimmerman* Action pending before the Honorable Michael A. Ponsor.

2.      On December 6, 2007, this Court certified a nationwide class action in the *Zimmerman* Action beginning on November 3, 1998.  Among the hundreds of thousands of injured consumers certified as part of the classes were the debt management plan ("DMP") customers of former defendant Cambridge Credit Counseling Corp. ("CCCC"), defendant Cambridge/Brighton Budget Planning Corp. ("Cambridge/Brighton") and three related for-profit entities: Brighton Credit Corporation of Massachusetts ("BC Mass."), Brighton Debt Management Services, Ltd. ("Brighton DMS") and First Consumer Credit Management Corp. ("First Consumer").

3.      On November 25, 2003, an action related to the *Zimmerman* Action seeking class certification of a substantially similar class of consumers was filed in the United States District Court for the Eastern District of New York.  That action was styled, *Limpert v. Cambridge Credit Counseling Corp.*, Case No. 03-cv-5986-TCP-WDW (the "*Limpert* Action").  The *Zimmerman* and *Limpert* Actions were litigated in a coordinated fashion.

4.      This Court in the *Zimmerman* Action subsequently awarded summary judgment to the certified classes and entered judgments in favor of the certified classes in the amounts of $259,085,983 against the corporate defendants and in the amount of $256,527,000 against John Puccio and Richard Puccio, jointly and severally.

5.      On March 18, 2009, this Court's final Order in the *Zimmerman* Action adjudicated the existence of a constructive trust (the "Constructive Trust") for the full amount of the judgment awards due and owing to the certified classes.

6.      Each of the Defendants in this action was paid monies deriving from and traceable to the Constructive Trust, which monies have at all times been the property of the Constructive Trust beneficiaries, namely the classes certified in the *Zimmerman* Action.  This action seeks the return of all Constructive Trust proceeds paid to Defendants.

7.      In addition to the claims to recover Constructive Trust proceeds brought against all Defendants, Plaintiffs also bring claims under the Credit Repair Organizations Act ("CROA") against Defendants.  Each of the Defendants was a "person" under CROA and a participant in conduct that has resulted in entry of summary judgment and judgment in the Zimmerman Action for violations of CROA.

## JURISDICTION AND VENUE

8.      This Complaint is filed and these proceedings are instituted under federal statutes over which this Court has federal question subject matter jurisdiction and under state statutes over which this Court has supplemental subject matter jurisdiction.

9.      The jurisdiction of this Court is based upon 28 U.S.C. §1331 and 15 U.S.C. §1679g.

10.     The subject matter of this Court is further based upon the March 18, 2009 Judgment Order Regarding Defendants John and Richard Puccio in the *Zimmerman* Action (Document No. 420), wherein the Court "expressly reserv[ed] jurisdiction" over matters related to the Zimmermann Action and litigation concerning the judgments entered in the *Zimmerman*  Action for the benefit of the certified class.

11.     The subject matter of this Court is further based upon the All Writs Act, 28 U.S.C. §1651, and 28 U.S.C. §3202, which provide the federal courts with jurisdiction to issue writs in enforcement of its judgments.

12.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

13.     This Court possesses personal jurisdiction over each Defendant based on each Defendant's residence, presence, transaction of business and contacts within the United States, Massachusetts and/or this District.

14.     Venue is proper within this District under 28 U.S.C. §1391. A substantial part of the events or omissions giving rise to the claims and injury alleged occurred in this District.

## THE PARTIES

*Plaintiffs*

15.     Plaintiffs are the named plaintiffs, certified class representatives and members of the classes certified by this Court in the *Zimmerman* Action, which certified classes are the beneficiaries of a Constructive Trust established by this Court in its *Zimmerman* Action judgments.

*Defendants*

16.     Defendant BDO Seidman, LLP, is a limited liability partnership with its principal place of business at 130 East Randolph, Suite 2800, One Prudential Plaza, Chicago, IL 60601. At all relevant times, Defendant BDO Seidman had multiple offices located within the Commonwealth of Massachusetts and many of the operative facts complained of herein arose within this district. Defendant BDO Seidman regularly attended CCCC's Board of Directors meetings within this district.

17.     Defendant Chipetine Neu & Silverman LLP is a limited liability partnership with its principal place of business at 585 Stewart Avenue, Suite L-50, Garden City, NY 11530-4746.

18.      Defendant Kostin, Ruffkess & Company, LLC is a limited liability company formed under the laws of Connecticut and registered in the Commonwealth of Massachusetts as a Foreign Limited Liability Company on January 29, 1998.  It its has a Massachusetts office  at One Monarch Place, Suite, 2020, Springfield, MA 01144, and its Registered Agent is Steven M. Dane, who is located at the same office.

19.      With the express and constructive knowledge that the plaintiffs in the *Zimmerman* and *Limpert* Actions sought the creation of a constructive trust for the benefit of a class and with the knowledge of unlawful acts alleged in the *Zimmerman* and *Limpert* Actions, governmental lawsuits, other audits and/or investigations, BDO, Chipetine and Kostin accepted the engagements to represent defendants before the Internal Revenue Service by preparing and filing for them Form 990 informational returns.

20.      BDO began its relationship with CCCC, Cambridge/Brighton and the Puccios in 1996 and 1997, and provided audit services and prepared Form 990 returns through 2004 for them. In light of the outcomes of  numerous investigations initiated in 2003 and 2004, including investigations of CCCC by the Massachusetts Attorney General, the Massachusetts Senate, the Internal Revenue Service, the United States House of Representatives, and the United States Senate, BDO declined in 2005 to continue providing services to the CCCC and Cambridge/Brighton.

21.      Notwithstanding the foregoing investigations, and widespread abuse of tax exemptions and non-profit status in the credit counseling and debt management industry, all of which on information and belief became known to Defendant Chipetine Neu & Silverman LLP,

Chipetine undertook responsibility in 2005 for auditing CCCC for its year 2003 and Cambridge/Brighton for its year 2004, and also prepared and filed Forms 990 for those periods.

22.     In the following year, Chipetine withdrew, or was replaced by Kostin, Ruffkess & Company, LLC, which audited CCCC for its year 2004, and prepared and filed its Form 990 for that year, and possibly for subsequent years.  On information and belief, it may also have provided services to CBBPC.

23.     During the term of the Constructive Trust, BDO, Chipetine, and Kostin were paid monies deriving from and traceable to the Constructive Trust, which monies have at all times been the property of the Constructive Trust beneficiaries, namely the certified classes in the *Zimmerman* Action.

24.     A partial list of the monies paid to BDO that derived from and are traceable to the Constructive Trust includes the following payments:

a.     $10,595 from CCCC according to a listing of items purchased by vendor in 1997;

b.     $55,130 from CCCC, according to the IRS Form 990 filed by CCCC for the year ended July 31, 1998;

c.     $68,376 from CCCC, according to a listing of items purchased by vendor in 2000;

d.     $33,140 from CCCC, according to a listing of items purchased by vendor in 2001;

e.     $90,715 from CCCC, according to the IRS Form 990 filed by CCCC for the year ended July 31, 2002;

f.     $  $94,021.00 from Cambridge/Brighton according to a listing of items purchased by vendor in 2003

     g.  $113,140 to BDO Seidman, according to the 2003 IRS Form 990 filed by CCCC;

     h.  $73,465 from CCCC, according to a listing of items purchased by vendor in 2004.

25.    A partial list of the monies paid to Chipetine that derived from and are traceable to the Constructive Trust includes the following payments:

     a.  $64,267.00 from Cambridge/Brighton according to in a listing of items purchased by vendor in 2005;

     b.  $102,617 from CCCC for the services of Jerrold Silverman according to in a listing of items purchased by vendor in 2004.

26.    BDO, Chipetine and Kostin in active concert with the defendants in the *Zimmerman* Action were "persons" under the CROA, and by preparing and filing Form 990 informational returns with the IRS for CCCC and Cambridge/Brighton and by otherwise representing the "non-profit" status and/or the tax exempt status of those entities, they (1) made or used untrue and misleading representations of the services of credit repair organizations CCCC and Cambridge/Brighton, in violation of 15 U.S.C. §1679b(a)(3) of the CROA; and (2) undertook acts, practices, and/or courses of business that constituted or resulted in the commission of, or attempts to commit, frauds or deceptions against consumers in connection with the offer or sale of the services of such those credit repair organizations in violation of 15 U.S.C. §1679b(a)(4) of the CROA.  The clients of CCCC and Cambridge/Brighton are among the classes certified in the *Zimmerman* Action which obtained judgments for violations of CROA.  In addition, with the express and constructive knowledge that the plaintiffs in the *Zimmerman* and *Limpert* Actions sought the creation of a constructive trust for the benefit of a class and with the knowledge of

unlawful acts alleged in the *Zimmerman* and *Limpert* Actions, governmental lawsuits, other audits and/or investigations, Chipetine and Kostin accepted engagements to continue to prepare and file information tax returns and to provide other financial services to CCCC and/or Cambridge/Brighton as non-profit organizations.   During the term of the Constructive Trust, BDO, Chipetine and Kostin were paid monies deriving from and traceable to the Constructive Trust, which monies have at all times been the property of the Constructive Trust beneficiaries, namely the certified classes in the *Zimmerman* Action.

## FACTUAL ALLEGATIONS

### The *Zimmerman* Judgments and Constructive Trust

27.    The Zimmerman Action was filed in this Court on November 3, 2003.

28.    On November 25, 2003, a related action to the Zimmerman Action seeking class certification of a substantially similar class of consumers was filed in the United States District Court for the Eastern District of New York.  That action was styled, *Limpert v. Cambridge Credit Counseling Corp.*, Case No. 03-cv-5986-TCP-WDW (the "*Limpert* Action").  The Zimmerman and *Limpert* Actions were litigated in a coordinated fashion.

29.    This Court granted Plaintiffs' motion for class certification in the Zimmerman Action on December 6, 2007, therein certifying the following classes:

(a).    A sub-class of all individuals who entered into a contract for a debt management plan with Cambridge Credit Counseling Corp. [CCCC] from November 3, 1998 through September 18, 2006 ("Sub-Class 1"); [and]

(b).    A class of all individuals who at any time after November 3, 1998 through the present paid, directly or directly, any money or other valuable consideration to Brighton Credit Corp. of Massachusetts, Brighton Debt Management Services, Ltd., First

Consumer[] Credit Management Corp. for any service related to the individual's DMP [debt management plan] ("Class 1").

*Zimmerman* Action Document Nos. 230, 231.  The certified *Zimmerman* Action classes include the debt management plan ("DMP") clients of CCCC and Cambridge/Brighton.

30.     On January 7, 2008, this Court in the *Zimmerman* Action granted Plaintiffs' and the certified classes' motion for summary judgment under the Credit Repair Organizations Act and M.G.L. ch. 93A.  *Zimmerman* Document No. 233, *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254 (D. Mass. 2008) (Ponsor, J.).

31.     That summary judgment decision determined that all of the defendants were credit repair organizations or CROA "persons" based upon their collective activities in controlling, marketing, soliciting, selling, servicing and/or administering DMPs or profiting from the ownership and control of the *Zimmerman* Action Defendants who engaged in the unlawful conduct.

32.     The summary judgment decision held that the credit repair organizations and/or CROA persons were liable to Plaintiffs and the classes for among other things, making deceptive and misleading statements, and undertaking acts, practices, and/or courses of business that constituted or resulted in the commission of, or attempts to commit, frauds or deceptions against consumers in connection with the offer or sale of the services of such those credit repair organizations in violation of 15 U.S.C. §1679b(a)(4) of the CROA..

33.     This Court's summary judgment decision stated as follows:

Between its creation and December 31, 2004, CCCC received $185,736,640 of income from customers. Clients' initial up-front payments accounted for $70,494,408 of that amount, with the rest coming from monthly fees. From

November 3, 1998 to December 31, 2004, . . . and CBBPC earned $10,291,640.

*Zimmerman*, 529 F. Supp. 2d at 262.

34.     The *Zimmerman* Action summary judgment decision further held that the defendants in *Zimmerman* violated the Massachusetts Consumer Protection Act, M. G. L. c. 93A, for engaging in unfair and deceptive acts and practices.  *See Zimmerman*, 529 F. Supp. 2d at 280-81.

35.     CCCC and the other corporate defendants were the alter egos of John Puccio and Richard Puccio, as held by this Court, and all monies paid to or from any the *Zimmerman* Action defendants were for the benefit of John and Richard Puccio.  *See Zimmerman*, 529 F. Supp. 2d at 271-72, 280.

36.     On December 2, 2008, this Court entered judgment against the entity defendants in the *Zimmerman* Action, jointly and severally, in the amount of $259,085,983.00.   In its ORDER REGARDING PLAINTIFFS['] EX PARTE MOTION FOR DEFAULT JUDGMENT AGAINST ALL UNREPRESENTED ENTITY DEFENDANTS entered that same day, this Court stated:

> The amount of judgment against the defaulted entities listed above is $259,085,983.00. The court has previously entered judgment on liability based upon its allowance of Plaintiff's Motion for Summary Judgment. See Dkt. No. 33. The amount of money that the court found was paid by consumers directly or indirectly to the defendants now defaulted is virtually uncontested. *See* Dkt. No. 233 at 16 and 15 U.S.C. §1679(g)(1)(B). This amount of judgment is without any multiplier, which plaintiffs would very possibly be entitled to under the pertinent statutes. The very remote likelihood, as a practical matter, that the defaulted entities will be capable of paying a judgment remotely equaling the $259,085,983.00 sum ordered by the court, however, makes consideration of any enhanced judgment unnecessary.

*Zimmerman* Action Document No. 313 at 2-3.

37.     On March 18, 2009, this Court entered judgment in the *Zimmerman* Action against defendants John Puccio and Richard Puccio, "jointly and severally with one another and all other defendants pursuant to this Court's prior judgment," in the amount of $256,527,000, plus interest and costs.  *Zimmerman* Action Document No. 420.  The March 18, 2009 Judgment Order Regarding Defendants John and Richard Puccio further imposed a constructive trust for the full amount of the judgments entered in the *Zimmerman*  Action for the benefit of the certified class:

> Pursuant to the Court's inherent equitable powers and the equitable powers granted by M.G.L. Chapter 93A, §11, the Court imposes the following equitable and declaratory relief.  The Court finds that because John Puccio and Richard Puccio are or were agents or representatives of such CSOs within the meaning of M.G.L. Chapter 93, §68B, and were persons within the meaning of 15 U.S.C section 1679b, who engaged in a pervasively deceptive course of business involving fraudulent misrepresentations to consumers by former CCCC, and by other defendant organizations during the class period, all for the purpose of receiving personal benefit from the defendant entities and from former defendant CCCC, grounds exist for the imposition of other and further equitable relief.  Therefore, the Court does hereby ADJUDGE ORDER AND DECREE the imposition of a constructive trust over all fees that consumers paid to the current or former defendant entities, including Cambridge Credit Counseling Corp.  Such trust shall include without limitation all monies or benefits in kind, whether salary, distributions, or other payments of money, satisfaction of accounts or charges for services or purchases of real or personal property:
>
> > a.      traceable as payment from any defendant or former defendant to or for the benefit of John or Richard Puccio;
> >
> > b.      traceable as payment from any defendant or former defendant to or for the benefit of members of the families, friends or associates of John Puccio and/or Richard Puccio; and/or;
> >
> > c.      traceable as payment from any defendant or former defendant to or for the benefit of any manager or employee of any defendant or former defendant that is in excess of the fair value of such person's services rendered.

38.     After the filing of the *Zimmerman* Action, certain of the *Zimmerman* Action defendants were sued or investigated by various state Attorneys General and federal government agencies.  Among the states or commonwealths that filed lawsuits against the *Zimmerman* and *Limpert* Action defendants were Massachusetts, Illinois and North Carolina.

39.     From the commencement of the *Zimmerman* and *Limpert* Actions, the plaintiffs in those actions sought the creation of a constructive trust for the benefit of the injured classes of consumers.  Each of the accounting firms named as a defendant in this Action accepted engagements to provide services to CCCC and Cambridge/Brighton with that knowledge.  Audit reports prepared by BDO and Chipetine acknowledged claims against them for disgorgement.

40.     Each of the Defendants was paid money deriving from and belonging to the Constructive Trust.  Those trust monies must be returned to the Constructive Trust beneficiaries, namely the certified classes.

### The Cambridge Model

41.     From the 1950s through the 1990s, the credit counseling, debt/management industry in the United States was created and operated largely by local social service agencies that typically charged minimal fees to an individual struggling with unsecured debts, in exchange for renegotiation with banks and creditors of certain aspects of the individual's repayments. While these agencies would charge little to the individual, they would collect "Fair Share" payments of a percentage of the collected debt from the individual's banks and creditors.

42.     Beginning in approximately 1993, John and Richard Puccio began operating a credit counseling business on a model they have described as the "Cambridge model" consciously different from the social service model.

43.     The Cambridge model was predicated on the mass marketing of credit counseling and debt management services to individuals nationwide, not just locally.

44.     The Puccios initially ran their DMP business in New York through two for-profit corporations, Cambridge Credit Corp. ("CCC") and Brighton Credit Corp. ("BCC"), both defendants in the *Zimmerman* Action.

45.     Even in the early going, the Cambridge model proved very successful and by 1996, although the business was still very young, CCC and BCC had approximately 5,400 individual clients.

46.     On October 28, 1996, the New York Banking Department issued a cease and desist order to both CCC and BCC ordering them to stop doing business since they were violating New York law, which, among other things, requires all budget planners to be licensed by the New York Banking Department.

47.     That event, the passage of the CROA exempting non-profits from its coverage, and the preference of credit card companies for working with non-profit agencies made it clear to the Puccios that the nationwide business operated by CCC and BCC would have to be operated by an entity that was ostensibly federally tax exempt and/or a not-for-profit corporation.

48.     An analysis of the laws of the states in close proximity to New York showed that Massachusetts was an appealing location in which to expand the Cambridge model of credit

counseling and debt management. The laws of Massachusetts allowed for incorporation of a DMP business that had unrestricted fees in a not-for-profit form, and also allowed for operating that business on a nationwide basis.

49.     The Puccios therefore decided to move their primary operations to Massachusetts for the time being and to form a Massachusetts "non-profit" corporation.  On November 27, 1996, when John Puccio, assisted by counsel, caused CCCC to be incorporated in Massachusetts.

50.     Nine days later, Puccio caused Cambridge/Brighton to be formed under New York law as a not-for-profit corporation to serve New York residents.   CBBPC did not, however, receive a license to operate as a New York budget planner until 2002.

51.     Chris Orella, a C.P.A. with BDO, was an old friend of two of John Puccio's lieutenants, Kurt Meyer and Arthur Wobig.  They introduced Orella and BDO to John Puccio.

52.     On information and belief, with BDO's and its counsel's assistance, CCCC on or about September 25, 1997 filed Form 1023 with the Internal Revenue Service ("IRS") seeking tax exempt status under section 501(c)(3) of the Internal Revenue Code.  Based only on CCCC's formation as a Massachusetts non-profit, and the Form 1023's representations about how it would do business, the company received a tax-exempt organization determination letter from the IRS on February 12, 1998.

53.     Cambridge/Brighton also applied for 501(c)(3) status, and advertised that its application was pending.  Its application to become a tax-exempt organization, however, was withdrawn before it was rejected by the IRS.  This occurred in the same time frame during which

the Massachusetts Senate and both houses of the U.S. Congress investigated and reported on  the conduct of CCCC, Cambridge/Brighton and the Puccios' other companies.

54.     After the filing of the *Zimmerman* Action, the IRS issued an audit report recommending revocation of the federal tax exempt status of CCCC, based on conduct that was the subject of the *Zimmerman* and *Limpert* Actions and the state Attorney General lawsuits and investigations.  A true copy of the report will be filed under seal.  BDO assisted in responding to investigative inquiries on CCCC's behalf and on information and belief gained knowledge of its contents while it was still employed by CCCC.  Chipetine and Kostin also knew or should have gained knowledge of its contents.

55.     Although CBBPC had sought to obtain federal tax-exempt status, CBBPC subsequently abandoned its efforts to gain federal tax-exempt status.

56.     BDO Seidman conducted its first audit of CCCC in mid-1997 and found a surplus of $85,000.  It continued to audit CCCC through 2002, audited Cambridge/Brighton in 2002 and 2003, and at all relevant times had intimate financial knowledge of these two organizations and of their financial relationships with other Puccio business entities.

57.     From October 16, 1997 through December 2003, BDO Seidman was present at CCCC's board meetings through its partner Chris Orella.

58.      At the first board meeting of CCCC, on October 16, 1997, Orella walked the new board of directors through the first meeting, personally presenting or leading the board in eight out of ten reported topics, including both financial and operational performance.

**BDO's Asset Valuation Enabled the Puccios to Profit from Converting to Non-Profits**

59.     Also at the first board meeting, Orella told the board that CCCC already had "extraordinary" growth, had submitted a Form 1023 application for recognition as a tax-exempt organization, and had purchased two for-profit debt consolidators, CCC and BCC.

60.     The sale transaction from CCC and BCC to CCCC was embodied in an Intangible Assets Sale Agreement.  The transaction was not negotiated at arms length because the Puccios controlled both the selling for profit organizations and the purchasing "non-profit" organization.

61.     To justify this sham transaction on paper, the Puccios hired and paid defendant BDO to place a value on the transaction.  BDO prepared a report dated June 30, 1997 which placed a value of $14.1 million on the following assets of CCC and BCC:

> Trademarks and goodwill in the marks utilizing  "Cambridge" and "Brighton" in connection with debt consolidation services, copyrights, goodwill, business plans, creditor contacts and relationships, referral source contacts and relationships, business "know-how," trade secrets and proprietary information . . . .

The report failed to note that the intangible assets of CCC and BCC were not protected by any federal copyrights or trademarks, and that the sale was under compulsion because CCC and BCC had been ordered to cease doing business.  A copy of the Report is attached hereto as Exhibit 1. Once CCCC gained an independent board, that body recognized the transaction as an "artificial sale" using language drawn from a U.S. Senate Report entitled *Profiteering in a Non-Profit Industry: Abusive Practices in Credit Counseling*, S. Rep. No. 109-55 (April 13, 2005) ("the Senate Report").

62.     In addition, in its Valuation Report, BDO noted a circumstance that ultimately resulted in part in the revocation of CCCC' s tax exemption.  It observed that credit card issuers "rely on debt counselors to recover some of their growing piles of charged-off debt", and described

the growth in magnitude of this private benefit conferred upon creditors by the *Zimmerman* Defendants' competitors, various Consumer Credit Counseling Service ("CCCS") firms associated with the National Foundation for Consumer Credit ("NFCC").

63.     In the Valuation Report, BDO wrote:

In 1982, CCCS distributed $85 million to creditors from debt-management plans.  Last year [1996], creditors received payments totaling about $1.6 billion.  Plus, another $1.6 billion was repaid in 1996 to creditors from consumers who received budget planning help from CCCS.  "That's more than $3 billion returned to creditors last year," notes Durant Abernethy, president and chief executive of the Silver Spring, Md.-based NFCC.  About 30% of that sum went to commercial-bank issuers of Visa and MasterCard credit cards.

The number of people counseled by CCCS has been growing at 25% to 30% a year.  "We used to be one of the best-kept secrets,' Abernathy says.  'We're now a primary alternative to bankruptcy.  People come to us voluntarily because they want to pay their bills."

64. .    In addition, the Valuation Report noted that "[t]raditionally, many creditors have collected a portion of their outstanding debt by supporting CCCS operations" and explained that creditors paid CCCS organizations about 15% of the [monthly] payment to help fund the operation, pointing out that "[t]hese concessions cost lenders less than having the consumer forced into bankruptcy."

65.     The Valuation Report continued its emphasis on this point from the creditors' perspective.

We believe this relationship with NFCC helps the overall collection process, and some of the consumers would go into bankruptcy without this healthy middle step,' says a spokesperson for American Express Co. a long-time supporter of the foundation.  Returns to creditors can be substantial.  The seven Chicago-area CCS offices, for instance, returned nearly $1 million to creditors in a recent month.

66.     BDO Seidman was correct in its assessment.  The credit counseling industry was formed in the 1960s through the efforts of creative credit card companies that saw an opportunity to use DMPs to collect debt placed at risk by the alternative of bankruptcy.

67.     CCCC's and Cambridge/Brighton's DMP operations resulted in a purely private benefit to the numerous creditors of their DMP customers.  The IRS recognized, and the plaintiffs and the certified Zimmerman Action class allege here, that while CCCC's related organizations have certainly benefited in a purely private (and therefore unlawful) way from the hundreds of millions of dollars in fees consumers paid to CCCC for the setting up and processing of their DMPs, the far greater private beneficiary of the DMP "services" that CCCC and Cambridge/Brighton sell were the creditors of the CCA Defendants' clients to whom hundreds of millions of dollars were paid.

68.     BDO knew or should have know that this substantial benefit to the credit card companies disqualified CCCC from being a 501( c)(3) tax exempt non-profit.

69.     Consistent with the common ownership and pervasive control by the Puccios of all of the entities in their DMP business, and the confused intermingling of activity between their business entities, neither the Intangible Assets Sale Agreement nor BDO's purported fair market value appraisal of CCC and BCC's intangible assets made any functional or other distinction between CCC and BCC.

70.     Using the BDO report, the Puccios then caused the "non-profit" CCCC they had just formed to obligate itself to pay the $14.1 million to their for-profits, CCC and BCC over a 50 year period.

71.     The conversion of the Cambridge model into ostensibly non-profit organizations was an accounting trick because the asset "sale" from CCC and BCC to CCCC was nothing but a vehicle to funnel money out of non-profit CCCC into CCC and BCC, and from there into the Puccio's pockets.  CCC and BCC continued to exist solely to receive the installment payments due under the Sale Agreement.

72.     Rather than modifying their operations to conform to the standards of a non-profit and tax exempt organization, the Puccios sought to continue the successful business operations of the Cambridge model using the vehicle of CCCC.

73.     BDO had reason to know that the conversion was fraudulent, since it audited CCCC and prepared its Form 990 tax return, and knew that no new operating policies were implemented by CCCC as a result of the transfer of assets from CCC and BCC.

74.     In CCCC's second board meeting on April 30, 1998, Chris Orella advised the board that the IRS had granted tax-exempt status to CCCC, and that the ruling was "definitive."  He also spoke of the company's growth and noted that once the company switched to Mastercard's Remittance Payment Service, banks could refer clients to CCCC, and its competitors would be pushed out of the way.    Again, BDO knew that CCCC was not operating as a true non-profit.

75.     In the late 1990s the Puccios' conglomerate began to advertise heavily, and to grow its business.  Its first television advertising was conducted in late 1999.

76.     Over the past decade, hundreds of thousands of American consumers had become over-laden with credit-card debt, trapped with penalties and high interest rates, and driven to the brink of bankruptcy and despair by a bleak debt-laden financial future.  Aiming itself directly at

this sub-prime market, CCCC advertised and promoted itself in print and broadcast media as exempt from taxation under §501(c)(3) of the Internal Revenue Code, as "America's Premier Debt Management Firm", as "a leader in the non profit credit counseling industry." On information and belief, BDO knew of these representations.

77.    Similarly, in the early 2000's Cambridge/Brighton would call itself a "Professional Debt Management Organization" and represented that it was "a New York State licensed Not For Profit organization offering credit counseling and educational assistance to consumers throughout the United States."   Though it represented that a request for 501(c)(3) tax-exempt status was pending, that status was never granted.

78.    CCCC's growth was so strong that it accelerated its payments to CCC and BCC, resulting in annual payments to them of $2,742,614 in fiscal 1998, $1,239,731 in 1999, $1,542,047 in fiscal 2000, $5,153,321 in fiscal 2001.  By July 31, 2002, the balance due was only $2,600,582. BDO was aware of these payments from auditing the company and preparing its Forms 990.

79.    CCCC retained millions of dollars in earnings every year.  By the end of the four years ending in 2002, on four-year revenues of approximately $142,370,000, CCCC had built up net assets of $25,736,642 (from only $85,726 as of August 1, 1997).  In its first non-profit return (year ending July 1998), it reported on returns prepared by BDO an excess of revenues over expenses of $777,827.  For the year ending in 1999, it reported an excess of $4,039,608.  For the year ending in 2000, it reported an excess of $4,250,470.  For the year ending in 2001, it reported an excess of $7,352,839, and for the year ending 2002, it reported an excess of $8,518,673.

80.    Of CCCC's $38,879,141 in revenues for its year ending in 2001, $15,729,985 were

initial fees paid by clients, $14,628,813 were continuation fees paid by clients, and $7,962,390 were fees paid by creditors for collection of debts.

81.     Ultimately, as confirmed by government audits and investigations, and the decisions of this Court in favor of the certified classes, the Cambridge model, CCCC and Cambridge/Brighton were nothing more than DMP sales organizations that held themselves out as non-profits.  They served as false non-profit fronts for a single commercial enterprise that included CCC, BCC,  sibling back-office processing entities BC Mass., Brighton DMS, First Consumers, and marketing and advertising entities  Debt Relief Clearing House, Ltd. ("DRCH"), and Cypress Advertising and Promotions, Inc. ("Cypress").

82.     The most significant and substantial purpose of CCCC's and Cambridge/Brighton's operations was to make money by selling DMPs to consumers.

83.     This activity was non-exempt not only because of the private benefit that their operations conferred on creditors, but also because each DMP that CCCC or Cambridge/Brighton sold generated business for the related for-profit entities BC Mass., Brighton DMS, and First Consumers, all of which were owned by John and/or Richard Puccio, and generated substantial profits servicing the DMPs and administering or providing virtually all aspects of the CCA's business operations, from furniture, to employees, to customer services. BDO had knowledge of these facts, but continued to file Form 990s for CCCC, representing  that it was a true 501(c)(3) charity.

84.     Indeed, largely based upon these relationships and the private benefit and inurement that flowed from them, the IRS made a determination that it was warranted to revoke

CCCC's 501(c)(3) status.  The findings of the IRS are confidential and will be filed separately and under seal as Exhibit 2 and incorporated herein by reference.  This Court is already familiar with these findings.

85.     The non-profit and/or tax-exempt status of the organizations was an important marketing tool that the *Zimmerman* defendants used to promote their DMP sales efforts.  Those statuses appealed to consumers who wanted competent and professional advice and services from independent and disinterested organizations.

86.     CCCC's and Cambridge/Brighton's actual business operations, however, were at all pertinent times inconsistent with those of a non-profit entity with tax exempt status under Section 501(c)(3) of the Internal Revenue Code.  CCCC and Cambridge/Brighton engaged only in minimal activities that further an exempt purpose and operated like for-profit businesses. BDO was aware of these facts.

87.     Because of their intimate familiarity with the businesses and finances of CCCC and Cambridge/Brighton, Defendants BDO, Chipetine and Kostin knew at all relevant times that more than an insubstantial part of CCCC's and Cambridge/Brighton's activities were not in furtherance of an exempt purpose and that their net earnings inured in whole or in large part to the private benefit of the individuals who formed the two companies and/or to the private benefit of for-profit business entities.

88.     After the fraudulent Intangible Asset Purchase, rather than advise CCCC to comply with the obligations of its tax-exempt status, or decline to perform services for CCCC, Defendants BDO, Chipetine and Kostin materially advanced CCCC's and Cambridge/Brighton's frauds upon

the public by continually conducting audits and preparing, signing and filing Form 990 information returns with the IRS.  In so doing, Defendants misrepresented the services of credit repair organizations CCCC and Cambridge/Brighton and engaged at least indirectly in a course of business that constituted or resulted in the commission of, or an attempt to commit, frauds or deceptions in connection with the offer or sale of the services of CCCC and Cambridge/Brighton. BDO continued in its violations of the CROA at least as late as 2005 when it re-filed CCCC's 2002 Form 990 tax return.

89.     CCCC, with the assistance of defendants BDO, Chipetine and Kostin, publicly asserted their tax-exempt and non-profit status and denied their credit repair organization ("CRO") status by filing on an annual basis a Form 990 Return of Organization Exempt from Income Tax for tax years 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003 and 2004.  BDO and Chipetine did the same for Cambridge/Brighton in its 2001 and 2002 Form 990s and audits.

90.     CCCC's Form 990s prepared by Defendants falsely stated that the purpose of the purchase transaction between CCCC and its predecessors was for "conversion to not for profit."

91.     Cambridge/Brighton, with the assistance of defendants BDO and Chipetine, publicly asserted its non-profit status and publicly denied its CRO status by filing on an annual basis Form 990 Return of Organization Exempt from Income Tax for the tax years 2002 and 2003. Those Form 990s did not disclose that Cambridge/Brighton had not ever received tax-exempt status from the IRS.

23

**With Defendants' Knowledge The Puccios Use BC Mass., Brighton DMS, First Consumer, Cypress and DRCH to Funnel DMP Processing Revenues Out of the CCA Defendants to the Puccios Individually.**

92.     The DMP business of CCCC and Cambridge/Brighton was so profitable that the Intangible Asset Sale Agreement did not create a sufficient funnel to allow the Puccios to siphon off all of the profits.

93.     BC Mass., Brighton DMS and First Consumer were all three under the common the ownership and pervasive control of the Puccios with defendants CCCC, Cambridge/Brighton, CCC, and BCC. Defendants knew these facts.

94.     BC Mass., Brighton DMS and First Consumer all three paid John and Richard Puccio salaries and dividends, and on information and belief were used by them as a mechanism to facilitate the siphoning of CCCC's revenues to the Puccios.

95.     When the for-profit to not-for-profit conversion of CCC and BCC to CCCC occurred in November of 1996, the Puccios also caused BC Mass., another newly formed for-profit entity owned exclusively by John and Richard Puccio, to enter into a contractual relationship with CCCC for certain services.

96.     CCCC and BC Mass. entered into an Agreement, whereunder BC Mass. would provide CCCC with office furniture, equipment and computers, software licenses, telemarketing and customer service support, for a fee "calculated to be equivalent to the actual cost to [BC Mass.] of providing [the same]."

97.     The Puccios each received compensation from defendant BC Mass. of $150,000 for the year ending 1998, $180,000 for the year ending 1999, $156,000 for the year ending 2000, $173,536 for the year ending 2001, and $312,000 for the year ending 2002.

98.     The Puccio's compensation, which came in part from revenues of BC Mass.'s contract with CCCC exceeded greatly the "actual cost" to it of providing the furniture, equipment, software and telemarketing and customer services that it provides.

99.     Since 1998, BC Mass and Brighton DMS realized combined gross receipts in excess of $40.5 million.   Most of their gross receipts were paid by CCCC and Cambridge/Brighton.

100.    According to Mike Gazzani, a C.P.A. and CCCC's corporate Treasurer, who also prepared the tax returns for the Puccios and for their for-profit organizations, since 1998, BC Mass distributed millions of dollars in dividends to John and Richard Puccio. An exhibit he prepared in his deposition in the *Zimmerman* Action, confirmed that the Puccio's each received at least $982,599 in 2000; $1,766,399 in 2001; $1,131,990 in 2002; $1,137,926 in 2003; and $27,641 in 2004 from BC Mass.  A true copy of the exhibit from Gazzani's deposition in the *Zimmerman* Action summarizing the Puccios' income from the credit counseling conglomerate fronted by non-profits CCCC and Cambridge/Brighton is attached hereto as Exhibit 3.

101.    Brighton DMS was incorporated on March 21, 2003 to replace BC Mass. and perform DMP processing services for all DMPs sold by the CCA Defendants.

102.    John Puccio received in distributions from Brighton DMS $4,345,856 in 2003, and $2,691,769 in 2004 from Brighton DMS.

103.     The foregoing distributions the Puccios received from BC Mass and Brighton DMS were profits derived largely from DMP servicing paid for by CCCC and Cambridge/Brighton.

104.     The ability of BC Mass and Brighton DMS to make such distributions indicates that they were not charging CCCC and Cambridge/Brighton the "actual cost" of the services they rendered.

105.     On January 27, 2000, the Puccios created DRCH to "produce television infomercials" and to operate a call center to screen calls for the Defendant CCAs. It shared the same location as Cambridge/Brighton.

106.     In January 2000, CCCC paid Debt Relief Clearinghouse ("DRCH") $130 per client lead.   By July 1, 2001, $7,183,080 had been paid to it, an amount that exceeded the $130 per lead price.  To determine the actual price per lead CCCC was paying to DRCH, BDO did some simple math and divided that figure by the number of consumers referred (15,530) and calculated the referral fee to be $462.00.

107.     Then in a June 2002 CCCC board meeting attended by Chris Orella, Mike Gazzani, CCCC's corporate Treasurer, reported that each lead from DRCH actually generated a $2,550 "profit." from each referral was reported, and so "the referral fees have in turn increased from $462.00 to $750.00."   No request from DRCH was presented to the CCCC Board, but nevertheless, "The Board unanimously voted and agreed" on the increase.

108.     From 2000 to 2004, DRCH reported $44,700,684 in revenue. DRCH was a for-profit company owned and controlled by Mr. John Puccio and Mr. Richard Puccio and the revenue was primarily earned from CCCC and CBBPC.   BDO had knowledge of the use of the

myriad related entities to siphon money out of CCCC and CBBPC and into the pockets of John and Richard Puccio, yet it did nothing to stop or report these violations, and rather than decline further involvement, continued to represent to the public via the Form 990 filings that the Cambridge conglomerate was a true tax exempt charity.

109.    In a CCCC board meeting held on November 21, 2003, attended as usual by Chris Orella, the CCCC board discussed a Massachusetts Senate report that was unfavorable to the company, and two Massachusetts Civil Investigative Demands.  But the company celebrated the acceptance by the State of New York of Cambridge/Brighton's fee structure, calling it a "historical victory" because "we" were able to convince the banking authorities to make an exception to the fee restrictions embodied in New York law.

110.    At a CCCC board meeting held on December 29, 2003, attended by Chris Orella, CCCC considered several investigations of its practices, including a House of Representatives hearing, a Senate investigation, and an IRS Audit.  The resignations of Richard Puccio and Mike Gazzani in November were accepted at the meeting as part of a "restructuring" designed by John Puccio to make the board "independent." Chris Orella of BDO discussed the Ways & Means Committee investigation of the industry, indicated that executive compensation and education were issues, and opined that the industry "was likely to evolve to for-profit".  At the time, no agreements between CCCC and DRCH or CCCC and BC Mass had been approved by CCCC's board.  Company official Kurt Meyer told the board the agreements would be sent to them and would be voted on later.  Chris Orella of BDO Seidman told the board that the agreements were "iron clad."

111.    The minutes of the June 19, 2003 meeting of the Cambridge/Brighton Board of

Directors, report that John Puccio stated to the board that:

> The industry is no longer a community service.  What the IRS does not know is that the
> credit counseling industry is a billion dollar industry and that the government is basically
> being cheated out of millions of dollars in tax money.

Each of the Defendants had access to Cambridge/Brighton's board meeting minutes, and was

familiar with John Puccio's thinking on the issue. Nevertheless, BDO continued to assist the

Puccios' in the perpetration of frauds upon the Class.

**CCCC and Cambridge/Brighton Advertising Was Known to Defendants**

112.    Cambridge, Cambridge/Brighton and their for-profit sister marketing company,

DRCH advertised on radio, television and in print in an effort to expand their market.

113.    In their advertising, CCCC and Cambridge/Brighton trumpeted the claims that

CCCC was a non-profit and federally tax-exempt organization, and that Cambridge/Brighton was

a non-profit.  Those false statements we made only with the active assistance of BDO, and later

Chipetine and Kostin.

114.    CCCC  represented that it was:

> a 501 (c)(3) Not-For-Profit organization offering credit counseling and educational
> assistance to consumers throughout the United States. We are dedicated to assisting our
> clients in understanding and managing their debts by providing each client with the
> personalized attention necessary to achieve financial stability. It is our objective that, as
> our clients repay their debts through our company, they will become more educated about
> consumer debt and how it affects their lives. Our clients can then apply this knowledge to
> successfully manage their finances in the future.

115.    Cambridge/Brighton represented that it was:

> a New York State licensed Not-For-Profit organization offering credit counseling and
> educational assistance to consumers throughout the United States. We are dedicated to

assisting our clients in understanding and managing their debts by providing each client with the personalized attention necessary to achieve financial stability. It is our objective that, as our clients repays their debts through our company, they will become more educated about consumer debt and how it affects their lives. Our clients can then apply this knowledge to successfully manage their finances in the future.

116.     CCCC and Cambridge/Brighton also held themselves out as a "community service", representing: "[t]he great part of our service is that we are not a loan company.  We are a not-for-profit community service that works with your creditors to reduce the high interest rates your being charged.  By doing this, we are able to get you out of debt in a fraction of the time it would take you on your own, and we'll also be able to save you THOUSANDS of dollars in the process."

117.     CCCC's advertising also promoted it as "a pro-consumer organization".

118.     Typical CCCC and Cambridge/Brighton advertisements, web site pages, logos and contracts advertised their tax exempt and/or non-profit status.

119.     Each of these false representations was made possible, supported by, and confirmed publicly by Defendants when they prepared, signed and/or filed Form 990 information returns for the two entities.  Defendants' actions had the intention and the inevitable effect of publicly characterizing CCCC and Cambridge/Brighton as disinterested negotiators that had no profit motive.

120.     With respect to the non-profit and tax-exempt representations, they knew of the falsity of those representations, and understood that their services were integral to the maintaining the façade.

**CCCC and Cambridge/Brighton's Business Practices Were Those of For-Profit Companies, and This Was Known to Defendants**

121.    As C.P.A.s, auditors, accounts and professional financial advisors, Defendants were aware that indebted consumers calling CCCC and Cambridge/Brighton should receive fair, honest, tailored, unbiased counseling about what is best for their unique financial circumstances.

122.    CCCC and Cambridge/Brighton instead focused their "counselors" efforts almost exclusively on enrolling consumers in DMPs, and the "counselors" did not perform bona fide consumer credit counseling.  These facts were known or should have been known to Defendants because an reasonably thorough audit would have disclosed that (1) credit counselors were at all pertinent times influenced by bonus compensation policies and sales incentives that undermined employees' commitment to the best interests of consumers and created incentives to sell DMPs whether or not those were in the best interest of consumers; (2) little money was spent on training and qualifying employees to provide competent consumer credit counseling.

123.    For their collection services CCCC and Cambridge/Brighton also received a percentage of what they collected from creditors in the form of "fair share" payments, and from debtors as Monthly Payment Design Services fees and Payment Program Fees based on their non-profit status.  Such compensation compromises the ability of a credit counseling agency to give independent unbiased advice.

124.    CCCC reported the following "fees from creditors" as program service revenue in Form 990 tax returns prepared by BDO Seidman:

| Tax Year | "Fees from Creditors" |
|---|---|
| 1996 | $235,205 |
| 1997 | $2,059,548 |
| 1998 | $4,742,192 |

| 1999 | $5,987,906 |
| 2000 | $7,962,390 |
| 2001 | $12,212,652 |
| 2002 | $5,459,068 |

125.    Cambridge/Brighton reported the following "fees from creditors" as program service revenue in Form 990 tax returns prepared by BDO Seidman:

| Tax Year | "Fees from Creditors" |
| --- | --- |
| 2002 | $53,417 |
| 2003 | $811,947 |

126.    CCCC generated revenues greatly in excess of its expenses and compensated its senior executives and owners richly.  For its tax years ending in 1998, 1999, 2000 and 2001, the Puccio brothers were more richly compensated each year.  Their start-up "non-profit" paid each of them compensation of $210,400 in its first year ending 1998.  In the year ending in 1999, it paid them each $271,600 in compensation.  In the year ending in 2000, it paid them each $312,000 in compensation. In the year ending in 2001, it paid them each $391,958 in compensation, benefits and deferred compensation.   In the year ending in 2002, it paid them each $624,000 in compensation.

**BDO Was Fully Aware CCCC and Cambridge/Brighton Did Not Operate as
Non-Profit or Tax Exempt Organizations Described in Section 501(c)(3)**

127.    BDO, Chipetine and Kostin were each fully aware that CCCC and Cambridge/Brighton were part of a single commercial enterprise consisting of several credit counseling, debt management and marketing business entities, all owned by John Puccio and Richard Puccio, and were aware that CCCC and Cambridge/Brighton did not operate as organizations described in Section 501(c)(3) of the Internal Revenue Code.

31

128.    BDO was aware of these circumstances with respect to CCCC because it provided accounting services through 2004 in preparing Form 990 tax returns for CCCC for tax years 1996, 1997, 1998, 1999, 2000, 2001 and 2002, and conducting audits of the organization for the years 1997, 1998, 1999, 2000, 2001 and 2002.  In addition, its member Chris Orella provided John Puccio financial advice on business matters relating to his credit counseling businesses and attended substantially all CCCC board meetings through 2002.  Moreover, and the Puccios' credit counseling organizations were under investigation by the U.S. House of Representatives, the U.S. Senate, the IRS, and the Massachusetts state Senate and Attorney General commencing no later than 2003 and BDO had full knowledge of these facts.

129.    BDO also was aware of these circumstances with respect to Cambridge/Brighton because it provided accounting services through 2004 in preparing Form 990 returns for Cambridge/Brighton for tax years for tax years 2002 and 2003, and conducting audits of the organization for the years 2002 and 2003.  In addition, member Chris Orella provided John Puccio financial advice on business matters relating to his credit counseling businesses.

130.    Chipetine was aware of these circumstances with respect to CCCC because it audited the company and prepared and filed a Form 990 for it for tax year 2003, and had access to BDO's work product for prior years.  Moreover, the Puccios' credit counseling organizations were under investigation by the U.S. House of Representatives, the U.S. Senate, the IRS, and the Massachusetts state Senate and Attorney General.  A draft of the Senate Report severely critical of CCCC's and Cambridge/Brighton's business and accounting practices was issued on March 24, 2004, before Chipetine or Kostin signed any Form 990s for CCCC or Cambridge/Brighton.  And

yet they continued in BDO's footsteps making misleading and deceptive Form 990 filings with the IRS.

131.    Chipetine was also aware of all of the facts alleged above with respect to Cambridge/Brighton, because it audited Cambridge/Brighton for tax year 2004, and had access to BDO's work product for prior years.  Moreover, the Puccios' credit counseling organizations were under investigation by the U.S. House of Representatives, the U.S. Senate, the IRS, and the Massachusetts state Senate and Attorney General commencing in 2003 and Chipetine knew of these investigations.

132.    Kostin was aware of all of the facts alleged above with respect to CCCC because it audited the company and prepared and filed a Form 990 for it for tax year 2004 and had access to BDO's work product for prior years.  Moreover, the Puccios' credit counseling organizations were under investigation by the U.S. House of Representatives, the U.S. Senate, the IRS, and the Massachusetts state Senate and Attorney General commencing in 2003 and Kostin was aware of these investigations. The IRS issued its Audit Report concluding that CCCC should lose its federal tax-exempt status months before Kostin signed any Form 990s for CCCC. And yet it continued in BDO's and Chipetine's footsteps making misleading and deceptive Form 990 filings with the IRS.

133.    .

134.    Beyond the notes associated with its audit of CCCC's 2004 year, Kostin's intimate knowledge of the web of relationships among the various Puccio credit counseling companies is demonstrated by a July 2005 email centered on the receivables of the Puccio's advertising company, Cypress Advertising and Promotions, Inc. ("Cypress").  The email was written by

Kostin's Patricia A. Wilson to Tom Hebert, who was CCCC's Chief Financial Officer in 2005.

Only one of the entities mentioned, the Mortgage Store, may be unrelated to the Puccios or their

credit counseling businesses.  Kostin wrote:

> . . . I have also attached the receivables from companies that owe Cypress for the advertising purchased on their behalf. You will notice that the only company that appears to be paying is [CCCC].

> Mike told me that [Cambridge/Brighton] can not pay Cypress the $267,148 owed because the NY Banking Commission told [Cambridge/Brighton] not to pay related party transactions.

> Debt Relief Clearing Housing does not have the assets to pay Cypress - the only receivable DRCH has at 6/30/05 is from [CCCC] in the amount of $73,201.12 (please confirm that this is correct) and their payables are $1,049,991.97 ($978,616 is owed to Cypress).

> The Mortgage Store owes Cypress $521,614, but has stopped paying, Brian Davis [an attorney who enrolled Brighton DMS serviced credit counseling clients] has started litigation procedures against them, but the outcome is unknown.

> Mike [Gazzani] told me he wrote off the receivable owed to Cypress from Southfork [a Puccio asset liquidation company] because they were experiencing severe financial difficulties.

> [Brighton DMS] only owes Cypress $1,711 and has a receivable from [Cambridge/Brighton] of $85,000, but when [Cambridge/Brighton] paid [Brighton DMS] $60,000 after June 30, 2005, it was disbursed to shareholder distribution and wired to [First Consumer].

> I do not know where the $75,000 that you sent to Cypress on 8/10/05 was disbursed to, but since [CCCC] is the only company paying Cypress, you may want to track the disbursements of the payments you make to Cypress.

135.    From the time of BDO's earliest contact with the Puccios, the 1996 Form 990 it

prepared for CCCC identified four "Related Organizations" and reported of CCCC that:

SCHEDULE A      STATEMENT REGARDING ACTIVITIES WITH DIRECTORS,      STATEMENT   9
                TRUSTEES, PRINCIPAL OFFICERS OR CREATOR
                          PART III, LINE 2

2A - THE ORGANIZATION ACQUIRED THE INTANGIBLE ASSETS OF TWO COMPANIES FOR A TOTAL PURCHASE PRICE OF $14,100,000.   THE PREVIOUS OWNERS OF THE TWO COMPANIES CURRENTLY SERVE AS OFFICERS OF THE REPORTING ORGANIZATION.
2B - THE REPORTING ORGANIZATION HAS A NOTE PAYABLE IN CONNECTION WITH 2A ABOVE.   THE AMOUNT IS TO BE PAID OVER 50 YEARS IN EQUAL MONTHLY INSTALLMENTS OF PRINCIPAL AND INTEREST AT 7% PER ANNUM.  THE BALANCE AT JULY 31, 1997 WAS $13,653,942.
2C - THE REPORTING ORGANIZATION HAS AN AGREEMENT WITH A COMPANY OWNED BY TWO OFFICERS WHEREBY IT USES EQUIPMENT, PERSONNEL, SOFTWARE AND OTHER SERVICES ON A MONTHLY BASIS.   PURSUANT TO THE CONTRACT, THE REPORTING ORGANIZATION IS OBLIGATED TO PAY A FEE EQUIVALENT TO THE ACTUAL COST TO THE OTHER COMPANY OF PROVIDING THE SERVICES.

136.   The Form 990 informational return BDO prepared for Cambridge/Brighton for the 2002 tax year showed John and Richard Puccio on its listing of Key Officers, Directors, Trustees and Key Employees.  The 990 also listed payments under Compensation of the Five Highest Paid Independent Contractors for Professional Services in the amounts of $993,500 to Debt Relief Clearing House and $275,289 to Cypress Advertising and Promotions, Inc.   In addition, CCCC contributed $170,000 to Cambridge/Brighton, which had huge liabilities to related organizations, which those organizations refrained from enforcing.  The liabilities were as follows:

| FORM 990 | OTHER LIABILITIES | STATEMENT 3 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| DUE TO BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 713,730. |
| DUE TO DEBT RELIEF CLEARINGHOUSE LTD. | 955,000. |
| DUE TO CYPRESS ADVERTISING | 151,619. |
| DUE TO CAMBRIDGE CREDIT COUNSELING CORP. | 15,274. |
| TOTAL TO FORM 990, PART IV, LINE 65, COLUMN B | 1,835,623. |

137.    Cambridge/Brighton's 2002 Form 990 reported from related organizations paid to

John and Richard Puccio as follows:

| FORM 990 | PART V — OFFICER COMPENSATION FROM RELATED ORGANIZATIONS | | | STATEMENT 4 |
|---|---|---|---|---|
| OFFICER'S NAME | NAME OF RELATED ORGANIZATION | COMPEN-SATION | EMPLOYEE BEN PLAN CONTRIB | EXPENSE ACCOUNT |
| JOHN PUCCIO | BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 312,000. | 0. | 0. |
| JOHN PUCCIO | DEBT RELIEF CLEARINGHOUSE, LTD. | 26,000. | 0. | 0. |
| JOHN PUCCIO | CAMBRIDGE CREDIT COUNSELING CORP. | 624,000. | 0. | 0. |
| RICHARD PUCCIO | BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 312,000. | 0. | 0. |
| RICHARD PUCCIO | DEBT RELIEF CLEARINGHOUSE, LTD. | 17,000. | 0. | 0. |
| RICHARD PUCCIO | CAMBRIDGE CREDIT COUNSELING CORP. | 624,000. | 0. | 0. |

Such compensation does not include distributions that the Puccios also received from those

companies.  BDO and the other defendants knew or should have known of such compensation.

138.    The 2003 Form 990 return BDO prepared for Cambridge/Brighton again listed under Compensation of the Five Highest Paid Independent Contractors for Professional Services the following information as set forth below.  What it did not report and what BDO Seidman knew was that the entities listed were owned by the Puccios.

| Part II | Compensation of the Five Highest Paid Independent Contractors for Professional Services | |
| --- | --- | --- |
| (See page 2 of the instructions. List each one (whether individuals or firms). If there are none, enter "None.") | | |
| (a) Name and address of each independent contractor paid more than $50,000 | (b) Type of service | (c) Compensation |
| DEBT RELIEF CLEARINGHOUSE, LTD. 3001 EXPRESSWAY DRIVE NORTH, ISLANDIA, NY   11749 | MARKET SUBSCRIPTION FEES | 5590500. |
| CYPRESS ADVERTISING & PROMOTIONS, INC. 3001 EXPRESSWAY DRIVE NORTH, ISLANDIA, NY   11749 | ADVERTISING FEES | 1710870. |
| BRIGHTON CREDIT CORPORATION OF MASSACHUSSETS 3001 EXPRESSWAY DRIVE NORTH, ISLANDIA, NY   11749 | ADMINISTRATIVE SERVICES | 663,479. |
| BRIGHTON DEBT MANAGEMENT SERVICES, LTD. 3001 EXPRESSWAY DRIVE NORTH, ISLANDIA, NY   11749 | ADMINISTRATIVE SERVICES | 583,794. |

139.    Cambridge/Brighton's 2003 Form 990 stated that CCCC contributed $3,540,593 to it, and that it had liabilities to related organizations as follows:

| FORM 990 | OTHER LIABILITIES | STATEMENT 5 |
|---|---|---|

| DESCRIPTION | AMOUNT |
|---|---|
| DUE TO BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 76,955. |
| DUE TO DEBT RELIEF CLEARINGHOUSE LTD. | 1,160,250. |
| DUE TO CYPRESS ADVERTISING | 283,757. |
| DUE TO CAMBRIDGE CREDIT COUNSELING CORP. | 287,338. |
| DUE TO BRIGHTON DEBT MANAGEMENT SERVICES | 307,020. |
| CAPITAL LEASE OBLIGATION | 50,759. |
| TOTAL TO FORM 990, PART IV, LINE 65, COLUMN B | 2,166,079. |

140.     Cambridge/Brighton's 2003 Form 990 prepared by BDO reported John Puccio's compensation by related organizations as follows:

| OFFICER'S NAME | NAME OF RELATED ORGANIZATION | COMPEN-SATION | EMPLOYEE BEN PLAN CONTRIB | EXPENSE ACCOUNT |
|---|---|---|---|---|
| JOHN PUCCIO | BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 120,000. | 11,105. | 0. |
| JOHN PUCCIO | DEBT RELIEF CLEARINGHOUSE, LTD. | 26,000. | 0. | 0. |
| JOHN PUCCIO | CAMBRIDGE CREDIT COUNSELING CORP. | 624,000. | 0. | 0. |
| JOHN PUCCIO | BRIGHTON DEBT MANAGEMENT SERVICES, LTD. | 192,000. | 11,291. | 0. |

141.     As for Richard Puccio, the same 2003 Form 990 reported compensation as follows:

38

| | | | | |
|---|---|---|---|---|
| RICHARD PUCCIO | BRIGHTON CREDIT CORPORATION OF MASSACHUSETTS | 120,000. | 11,105. | 0. |
| RICHARD PUCCIO | DEBT RELIEF CLEARINGHOUSE, LTD. | 26,000. | 0. | 0. |
| RICHARD PUCCIO | CAMBRIDGE CREDIT COUNSELING CORP. | 624,000. | 0. | 0. |
| RICHARD PUCCIO | BRIGHTON DEBT MANAGEMENT SERVICES, LTD. | 192,000. | 11,291. | 0. |

142.    BDO also clearly recognized that Cambridge/Brighton did not actually perform the administrative services contracted for in its clients' DMPs.  Although BDO stated in its 2003 Form 990 that "debt management plan[s] [were] designed by [Cambridge/Brighton's] credit counselors" it confusingly stated that a "service provider" calculated the fixed monthly repayment.  The omission of any information that the "service provider" was a related for-profit, and other incomplete, confusing and conflicting representations combined to obscure the fact that Cambridge/Brighton did not complete the process of "designing" the DMP for which it charged a "design" fee.  Thus, BDO, with its knowledge, expertise and experience, knew that the work done by the Puccios' companies was not being done by even an ostensibly "non-profit" entity and it knew or should have known frauds were being perpetrated by the *Zimmerman* defendants. Driven by the large fees it was receiving, BDO turned a blind eye to these activities and continued to file Form 990's and assist with the perpetrations of the massive frauds. The 2003 Form 990 that BDO signed stated that:

Once the debt management program has been designed by the Corporation's credit counselors in conjunction with the consumer and creditors, the ongoing administrative and routine processing services are performed by the Corporation primarily through an outsourcing. In this regard, once the Corporation's credit counselor reviews and verifies the account(s) to be serviced, and designs the debt management program for the consumer, the credit counselor forwards such program and account information to the service provider, which is, in part, responsible for calculating the fixed monthly repayment that the consumer would pay as part of the Debt Management Program. Such calculation takes into consideration the repayment period and is based on the minimum payment the consumer's creditors will accept which is, in turn, based upon the creditors' debt management policies and the consumer's financial situation.

143.  Cambridge/Brighton's 2003 Form 990 prepared by BDO summarized Cambridge/Brighton's activities with other *Zimmerman* Defendants as follows:

```
SCHEDULE A              STATEMENT REGARDING ACTIVITIES WITH        STATEMENT   8
                      SUBSTANTIAL CONTRIBUTORS, TRUSTEES, DIRECTORS,
                           CREATORS, KEY EMPLOYEES, ETC,.
                                 PART III, LINE 2

    THE ORGANIZATION PAID FOR THE FOLLOWING GOODS/SERVICES FROM RELATED
    ENTITIES: 1) BRIGHTON CREDIT CORPORATION OF MA, ADMINISTRATIVE SERVICES,
    $663,479; 2) BRIGHTON DEBT MANAGEMENT SERVICES, LTD., ADMINISTRATIVE
    SERVICES, $583,794; 3) CAMBRIDGE CREDIT COUNSELING CORPORATION, OPERATING
    EXPENSES, $49,350; 4) CYPRESS ADVERTISING & PROMOTIONS, INC., ADVERTISING
    FEES, $1,710,870; 5) DEBT RELIEF CLEARINGHOUSE, LTD., MARKET SUBSCRIPTION
    FEES, $5,590,500.
```

144.  The operations of CCCC and Cambridge/Brighton were substantially identical. The only differences were that Cambridge/Brighton's operations began later in time and the two entities tended to focus on different states.  However, even this latter distinction made little difference: when both were operating, if one company's operations were questioned or under investigation by a state's regulatory agency, potential callers from that state would routinely temporarily be assigned to the other company.

145.    On information and belief, therefore, with the exception of the dollar amounts alleged, the allegations in the preceding paragraphs are generally applicable to Cambridge/Brighton's business practices, and are therefore repeated and realleged herein with reference to defendant Cambridge/Brighton.

## COUNT I

### RECOVERY OF CONSTRUCTIVE TRUST PROCEEDS

146.    Plaintiffs repeat and reallege Paragraphs 1 through - as though set forth herein.

147.    This Court in the *Zimmerman* Action imposed the Constructive Trust for the benefit of the certified classes in the *Zimmerman* Action.  The Plaintiffs are the certified class representatives for those certified classes.

148.    The Constructive Trust was adjudicated and created on March 18, 2009, and covers "all fees that consumers paid to the current or former defendant entities."   Its effective period, therefore, covers the period during which the credit counseling operations of CCCC and CBBPC continued to benefit the Puccios.

149.    Each Defendant has been paid monies by one or more of the *Zimmerman* defendants derived from and traceable to the Constructive Trust and its beneficiaries, namely the certified *Zimmerman*  Action classes.

150.    Each Defendant after November 2003 accepted payment of monies derived from and traceable to the Constructive Trust with the express or constructive knowledge that Plaintiffs in the *Zimmerman* Action and the plaintiffs in the *Limpert* Action sought a constructive trust over monies paid by the certified classes to the *Zimmerman*  and *Limpert* Action defendants.

151.     To the extent any Defendant has paid to any other person monies paid to it from or for the benefit of the *Zimmerman* Action defendants and traceable to the Constructive Trust, those payments are traceable and the property of the Constructive Trust created by this Court in the *Zimmerman* Action.

152.     No Defendant has returned or refunded any portion of Constructive Trust proceeds in its possession, or in the possession of others to whom any Defendant distributed Constructive Trust proceeds.

153.     Plaintiffs, as the certified class representatives for the certified *Zimmerman* Action classes, seek the return and refund of all Constructive Trust proceeds paid to or in the possession of all Defendants, with interest allowed by law.

## COUNT II.

### FOR VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

154.     Plaintiffs repeat and reallege Paragraphs 1 through 153 as though set forth herein.

155.     Plaintiffs and each member of Classes certified by this Court in the *Zimmerman* Action are "consumers" as that term is defined in 15 U.S.C. §1679a.

156.      The Classes certified by this Court in the Zimmerman Action includes the DMP clients of CCCC and Cambridge/Brighton.

157.     Certain of the Certified Classes members who joined Cambridge/Brighton DMPs continue to this day to be enrolled.

158.     Defendants are each a "person" as that term is used in 15 U.S.C. §§ 1679b and 1679g.

159.    The Defendants used instrumentalities of interstate commerce, including the mails to transmit Form 990 returns, audits and other materials necessary to support representations that CCCC and Cambridge/Brighton were tax exempt and/or non-profit organizations that could or would sell, provide or perform services, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving consumer's credit record, credit history or credit rating; and/or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).

160.    Defendants BDO, Chipetine and Kostin (collectively the "Defendants") have violated CROA for each of the same reasons set forth in this Court's *Zimmerman* Action summary judgment decision and order.

161.    Because of the very nature of a Form 990 return, it is a public document and is intended to be relied upon by the public .

162.    Defendants BDO, Chipetine and Kostin prepared and filed Forms 990 for CCCC and/or Cambridge/Brighton, which misrepresented the nature of those organizations and which the *Zimmerman* Defendants used to support their advertising claims and to lure in consumers with promises of credit improvement.   The allegations setting forth these advertisements and the promises of credit repair in the *Zimmerman* Action Amended Complaint (Document No. 65) are incorporated herein as if set forth fully herein.

163.    Defendants by filing Forms 990 each made untrue and misleading statements in violation of 15 U.S.C. §1679b(a)(3), whether or not any individual Defendant is itself or himself a credit repair organization.

164.     Defendants assisted CCCC and Cambridge/Brighton in materially and willfully, knowingly or recklessly misrepresenting information that credit repair organizations are required by the CROA to disclose to consumers and which was material to the establishment of the credit repair organization's liability to consumers under the CROA.

165.     The Defendants and each of them have engaged directly or indirectly in acts, practices, or courses of business that constitute or result in the commission of, or an attempt to commit, frauds or deceptions on persons in connection with the offer or sale of the services of a credit repair organization in violation of 15 U.S.C. §1679b(a)(4), whether or not any individual Defendant is itself or himself a credit repair organization.

166.     The Classes' statutory damages are restitutionary and are measured by the CROA as the "amount paid" by a consumer to the credit repair organization.  The Defendants themselves prepared and filed CCCC's and Cambridge/Brighton's' Forms 990 information returns, and Cambridge/Brighton's 2004 audit report (no Form 990 was filed for Cambridge/Brighton in that year) which reported annual fees paid to CCCC and Cambridge/Brighton.  The fees were categorized as "Design" or initial fees, and monthly service or continuation fees.  Plaintiffs demand damages from each Defendant in an amount equal to the total amount paid for the years for which a Defendant prepared and filed a Form 990.  Plaintiffs accordingly demand damages from BDO in the amount of at least $137,528,003.00; from Chipetine in the amount of at least $42,776,169.00, and from Kostin in the amount of at least $25,883,026.00.

167.     In addition, each member of the classes certified in the *Zimmerman* Action has been injured as a result of Defendants' violations of CROA, and the Defendants are jointly and

severally liable to the certified classes for the full amount of the *Zimmerman* Defendants' judgments.

168.    Each member of the classes certified in the *Zimmerman* Action is also entitled to interest at an annual rate of 12% in accordance with the law of Massachusetts.

169.    The classes certified in the *Zimmerman* Action are also entitled to their attorneys fees, pursuant to the CROA.

170.    Each member of classes certified by the *Zimmerman* Action are entitled to pursue a claim against Defendants pursuant to 15 U.S.C. §1679g to redress their violations of CROA.

## **JURY DEMAND**

The certified *Zimmerman* Action class representatives and classes demand a trial by jury on all issues so triable.

Dated: November 9, 2009

Respectfully submitted,

    /s/ Stephen G. Hennessy
STEPHEN G. HENNESSY (BBO 549914)
P.O. Box 477
Milton, MA  02816
Telephone:   617-696-1600
Facsimile:   617-696-1667

Garrett M. Smith
MICHIE HAMLETT
   ATTORNEYS AT LAW
500 Court Square, Suite 300, P.O. Box 298
Charlottesville, VA  22902-0298
Telephone:   434-951-7222
Facsimile:   434-951-7242

David Vendler (SBN 146528)
MORRIS POLICH & PURDY LLP
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone:  213-891-9100
Facsimile:   213-488-1178

Gregory S. Duncan
LAW OFFICES OF GREGORY S. DUNCAN
412 East Jefferson Street
Charlottesville, VA  22902
Telephone:  434-979-8556
Facsimile:   434-979-9766

G. Oliver Koppell
Daniel Schreck
G. OLIVER KOPPELL & ASSOCIATES
99 Park Avenue, 3rd Floor
New York, NY  10016
Telephone:  212-973-9
Facsimile:   212-97

Joseph S. Tusa
Paul C. Whalen
WHALEN & TUSA, P.C.
33 West 19th Street, 4th Floor
New York, NY  10011
Telephone:  212-400-7100
Facsimile:   212-658-9685

C. Allison Powell
C. ALLISON POWELL, P.C.
2625 Highland Avenue, Suite 705
Birmingham, AL  35205
Telephone:  205-930-4576
Facsimile:   503-905-1493

*Attorneys for Plaintiffs and Class Counsel for the
Certified Zimmerman Action Classes*

46